**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-1714**

───────────────

WILLIAM THORPE; FREDERICK HAMMER; DMITRY KHAVKIN; GERALD MCNABB; GARY WALL; VERNON BROOKS; BRIAN CAVITT; DEREK CORNELISON; CHRISTOPHER COTTRELL; PETER MUKURIA; STEVEN RIDDICK; KEVIN SNODGRASS,

            Plaintiffs – Appellees,

    v.

HAROLD CLARKE; RANDALL C. MATHENA; H. SCOTT RICHESON; A. DAVID ROBINSON; HENRY J. PONTON; MARCUS ELAM; DENISE MALONE; DR. STEVE HERRICK; TORI RAIFORD; JEFFREY KISER; CARL MANIS,

            Defendants – Appellants,

        and

VIRGINIA DEPARTMENT OF CORRECTIONS,

            Defendant.

------------------------

PROFESSORS AND PRACTITIONERS OF PSYCHIATRY AND PSYCHOLOGY; FORMER CORRECTIONS EXECUTIVES; RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER

            Amici Supporting Appellant.

───────────────

Appeal from the United States District Court for the Western District of Virginia, at Big Stone Gap.  James P. Jones, Senior District Judge.  (2:20-cv-00007-JPJ-PMS)

───────────────

Argued: January 25, 2022                          Decided: June 14, 2022

————————————

Before GREGORY, Chief Judge, THACKER, Circuit Judge, and FLOYD, Senior Circuit Judge

————————————

Affirmed by published opinion. Senior Judge Floyd wrote the opinion in which Chief Judge Gregory and Judge Thacker joined.

————————————

**ARGUED:** Margaret Hoehl O'Shea, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Vishal Mahendra Agraharkar, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia; Andrei Alexander Popovici, WHITE & CASE LLP, Washington, D.C., for Appellees. **ON BRIEF:** Mark R. Herring, Attorney General, K. Scott Miles, Deputy Attorney General, Michelle S. Kallen, Acting Solicitor General, Brittany M. Jones, Deputy Solicitor General, Laura H. Cahill, Assistant Attorney General, Rohiniyurie Tashima, John Marshall Fellow, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Tara Lee, Daniel Levin, Kristen J. McAhren, Timothy L. Wilson, Jr., Nathan Swire, WHITE & CASE LLP, Washington, D.C.; Eden Heilman, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia, for Appellees. Jacob Frasch, Washington, D.C., Robert P. Sherman, Boston, Massachusetts, Andrew P. Valentine, DLA PIPER LLP (US), East Palo Alto, California, for Amici Professors and Practitioners of Psychiatry and Psychology. Laura Rovner, Molly O'Hara, Student Attorney, Kevin M. Whitfield, Student Attorney, Jamie Ray, Student Attorney, Student Law Office, Civil Rights Clinic, UNIVERSITY OF DENVER STURM COLLEGE OF LAW, Denver, Colorado, for Amici Former Corrections Executives. Rosalind Dillon, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Chicago, Illinois; Daniel M. Greenfield, Roderick & Solange MacArthur Justice Center, NORTHWESTERN PRITZKER SCHOOL OF LAW, Chicago, Illinois, for Amicus The Roderick and Solange MacArthur Justice Center.

————————————

FLOYD, Senior Circuit Judge:

In this putative class action, Plaintiffs allege that as prisoners at two of Virginia's supermax facilities, they have suffered severe isolation in violation of the U.S. Constitution. Supermaxes are maximum-security prisons designed to segregate the most dangerous prisoners from the general prison population. Their use has increased in recent decades, in part as a response to the rise in prison gangs and violence. And conditions in these prisons have long been recognized as "synonymous with extreme isolation." *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005). They deprive prisoners of nearly all environmental and sensory stimuli and of nearly all human contact for 22–24 hours a day.

Plaintiffs acknowledge that isolation has a place in today's prisons. But they object the Virginia Department of Corrections (VDOC) has not used its supermax facilities for any legitimate penological purposes. Instead, Plaintiffs claim, Virginia and its officers have warehoused prisoners in solitary, without any meaningful path back to general population, to justify the profligate costs of building and running those institutions. Plaintiffs now bring this action against VDOC and several of its officials for violating their Eighth Amendment right to be free from cruel and unusual punishment and their Fourteenth Amendment right to receive sufficient process.

In response, Defendants focus on qualified immunity. Even if they committed the violations, Defendants posit, case law that existed in 2012, when their latest solitary-confinement program went into effect, simply did not put them on notice that either the conditions themselves or the procedures used to decide who belongs in them violated the Constitution. The problem for Defendants, however, is that they invoke qualified

3

immunity at the motion to dismiss, before any of the evidence is in.  And on the facts Plaintiffs have pleaded, Defendants cannot succeed:  On the Eighth Amendment charge, Plaintiffs have adequately alleged—even by Defendants' own measure—that Defendants knew the harms long-term solitary confinement causes and disregarded them.  But qualified immunity does not protect *knowing* violations of the law.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  As to the Fourteenth, Plaintiffs suggest Defendants violated even the most foundational due process guarantees: notice and an opportunity to respond.  Defendants cannot meaningfully argue they did not know due process requires at least that much.  *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).

Defendants' contentions boil down to disagreements over the facts: what they knew and when, and what procedures they offered in practice.  But at this stage, we take Plaintiffs' allegations as true and affirm the district court's denial of the motion to dismiss.

## I.

Plaintiffs are prisoners living in long-term solitary confinement—some as long as 24 years—in Red Onion and Wallens Ridge State Prisons VDOC operates.  They bring this action for declaratory and injunctive relief as well as damages against VDOC and several corrections officers who created and administered their segregation program.  Plaintiffs also seek to represent a class of similarly situated prisoners.  But this appeal comes to us at an early stage: the district court's denial of Defendants' motion to dismiss.  Well-pleaded allegations establish the following facts.

All Plaintiffs were originally sentenced to confinement in general population but were at some point assigned to either Red Onion or Wallens Ridge. VDOC built these supermaxes in the 1990s, six years after publishing a report that faulted a previous solitary facility, Mecklenburg, for using its confinement program to fill empty beds for economic, not penological purposes. Plaintiffs allege that Red Onion and Wallens Ridge have followed the same practices and for the same reasons. They point to several investigations and reports conducted by legislators and the U.S. Department of Justice that allegedly pressured VDOC in 2012 to introduce the Step-Down program to help progress prisoners to lower security levels through a system of incentives and periodic reviews. But even that program, Plaintiffs now maintain, runs roughshod over basic constitutional guardrails.

Step Down offers two pathways, Special Management (SM) and Intensive Management (IM). Both move prisoners through levels 0, 1, and 2 to a level called SL-6, whereupon VDOC maintains prisoners receive more freedoms, but Plaintiffs allege solitary confinement remains severe. The principal difference between IM and SM is that SM prisoners may one day be transferred to general population, provided they have no disciplinary infractions at SL-6, but IM prisoners may not—unless VDOC first reclassifies them as SM.

Plaintiffs allege concerning confinement conditions. They claim to spend 22–24 hours each day in cells smaller than a parking space. Steel doors, lined with solid strips, halt communication with others, and opaque windows obscure not just the outside but even the inside of the prison; bright lights stay on all day and night. Plaintiffs also claim to experience only perfunctory interactions with mental-health professionals and that

5

VDOC's answer to threats of self-harm is to strip prisoners naked, strap them to a gurney, and feed them a liquid diet until they change their minds. As for out-of-cell time, Plaintiffs allege they receive just one hour of non-contact visitation per week, a shower three times a week, and one hour of exercise a day in a small cage—but they must agree to a cavity search each time they wish to leave their cells. VDOC then denies Plaintiffs *all* productive activities, save for the *Challenge Series* workbooks that are supposed to aid prisoners' progress through Step Down. Adding to all that, Plaintiffs claim, they cannot earn any good-time credits (or earn them at a much-reduced rate) and cannot receive parole. Plaintiffs allege severe mental-health problems as a result, including psychosis, hallucinations, suicidal acts, and permanent neurological damage.

Plaintiffs also allege deficiencies in their status reviews. For both SM and IM designees, mill-run staff initially assess prisoners' progress. Supervised by a Unit Manager and a Building Management Committee (BMC), which often consists solely of the same Unit Manager, the staff fill out weekly Status Rating Charts. A negative review on the charts often means prisoners have to restart at level 0. Yet prisoners do not receive a hearing, do not have access to the charts, and cannot appeal any re-start decisions. VDOC provides two other, "formal" reviews. The Institutional Classification Authority (ICA) conducts one, every 90 days. But the ICA, according to Plaintiffs, does not review prisoners' "internal" progress through the program, only their "external" assignment to the supermax facilities. And it holds hearings that last only minutes and result in pre-filled, rote explanations such as "Remain Segregation." J.A. 95. The External Review Team

(ERT) conducts another review, but only for IM prisoners. Even then, the ERT provides no written decisions and reviews solely the *original* directive to place prisoners in IM.[1]

On top of this, Plaintiffs challenge the metrics corrections officers use to assess their progress through Step Down. They insist that individual officers have, by policy, unfettered discretion to retain, regress, or even restart prisoners in Step Down for reasons unrelated to any security concerns. As an example, Plaintiffs offer that even "prisoners who complete all nine volumes of the *Challenge Series* and remain free of all infractions have been forced to restart the program for failure to meet responsible behavioral goals, such as poor hygiene or disrespect." *Id.* at 89. On the flip side, Plaintiffs claim VDOC has refused to harness available tools based in science and research that can help curb aggressive behavior without inflicting severe mental harms. Altogether, Plaintiffs argue officials designed Step Down to stock enough prisoners in Red Onion and Wallens Ridge to justify the cost of constructing those impressive facilities—exactly what VDOC said it would not do after Mecklenburg.

Believing their confinement conditions violate the Eighth Amendment and Step Down's review process violates the Fourteenth, Plaintiffs filed suit. They sought declaratory and injunctive relief, including the abolition of Step Down and the end to long-term solitary confinement in such restrictive conditions. They also asked for compensatory

---

[1] For a more detailed description of the confinement conditions at Red Onion and Wallens Ridge, as well as the goals and operation of the Step-Down program, see *Smith v. Collins*, 964 F.3d 266, 270–73 (4th Cir. 2020).

damages, including for emotional pain and suffering.[2]  As Defendants, Plaintiffs named
VDOC along with eleven of its officials who created, administered, or implemented Step
Down, including the Director of VDOC, the wardens of the two supermax facilities, several
members of the ERT, and several persons responsible for providing mental-health services.

Defendants moved to dismiss for failure to state a claim and on grounds of qualified
immunity.  The district court declined.  On qualified immunity, it reasoned that "when this
suit was filed in May 2019, caselaw had clearly established that the Eighth Amendment
prohibited prison officials from depriving inmates of 'the basic human need for meaningful
social interaction . . .' without a legitimate penological interest." *Thorpe v. Va. Dep't of
Corr.*, No. 2:20CV00007, 2021 WL 2435868, at *8 (W.D. Va. June 15, 2021) (citing
*Porter v. Clarke*, 923 F.3d 348, 368 (4th Cir. 2019)).  And that, beyond caselaw, the risk
of prolonged detention in these conditions was obvious from the "extensive scholarly
literature describing and quantifying the adverse mental health effects of prolonged solitary
confinement that has emerged in recent years." *Id.* at *7 (citing *Porter*, 923 F.3d at 361).
The court also found that Plaintiffs have sufficiently alleged Defendants denied them
"meaningful" review required by clearly established due process principles.  *Id.* at *8
(citing *Incumaa v. Stirling*, 791 F.3d 517, 524, 532 (4th Cir. 2015)).  Defendants now
appeal the court's qualified-immunity rulings as to both claims.

---

[2]  Plaintiffs also challenged Defendants' performance under a previous settlement
agreement, which is not at issue in this appeal.

II.

We review the district court's refusal to dismiss for qualified immunity de novo, *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021), bearing in mind that Defendants carry the burden to demonstrate that immunity, *Henry v. Purnell*, 501 F.3d 374, 378 (4th Cir. 2007). And we accept all Plaintiffs' factual allegations as true. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).

III.

The Eighth Amendment inquiry proceeds in two parts: whether confinement conditions inflict harm that is, "objectively, sufficiently serious" to deprive prisoners of "the minimal civilized measure of life's necessities" and whether officers subjectively acted with "deliberate indifference to inmate health or safety" because they knew of but disregarded the inhumane treatment. *Farmer v. Brennan*, 511 U.S. 825, 834, 838 (1994) (cleaned up) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 302–03 (1991); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

Defendants agree Plaintiffs have adequately pleaded both those prongs to survive a motion to dismiss but urge the district court was wrong to deny them qualified immunity. Qualified immunity, too, has two prongs: Courts must decide whether a constitutional right was violated on the facts alleged and whether "the unconstitutionality of the officers' conduct was clearly established." *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). Defendants, having already accepted that Plaintiffs satisfactorily pleaded an Eighth Amendment violation, direct their arguments towards the second. Our case law, they insist,

9

did not clearly establish until the 2019 *Porter* decision that solitary confinement in itself can cause severe enough harm to implicate the Eighth Amendment.

Defendants rightly observe that we assess clearly established law at the time the wrong is committed, *e.g.*, *Mays*, 992 F.3d at 301, and in that way, *Porter* could not strip them of immunity for acts committed before 2019. But they misapprehend the nature of the Eighth Amendment inquiry and with it, *Porter*'s import. Eighth Amendment liability comes into play only where a corrections officer appreciates the harm confinement conditions impose yet chooses to disregard it—but qualified immunity does "not allow the official who *actually* knows that he was violating the law to escape liability for his actions." *Harlow v. Fitzgerald*, 457 U.S. 800, 821 (1982) (Brennan, J., concurring). Because Plaintiffs have adequately pleaded Defendants' deliberate indifference, the district court correctly denied qualified immunity at the motion-to-dismiss stage. And *Porter* only buttresses that holding as it helps illustrate that the harm to Plaintiffs was "obvious"—to explain, that is, why Plaintiffs have "plausibly alleged" just such indifference. *See Thorpe*, 2021 WL 2435868, at *6.[3]

---

[3] Defendants repeatedly challenge the district court's remark that the law was clearly established "when this suit was filed in May 2019." *Thorpe*, 2021 WL 2435868, at *8. We agree that misstates the law, but Defendants read too much into this slip. As the court went on to explain, in that very sentence, the Complaint had plausibly alleged Defendants acted "without a legitimate penological interest and despite the well-documented attendant psychological and emotional harms." *Id.* And, as discussed, other parts of the court's opinion relied on *Porter*'s reasoning to demonstrate why the harms were "obvious." *Id.* at *6–7 (affirming the magistrate's findings on the "subjective prong" of the analysis). On the whole, then, the court denied qualified immunity not because *Porter* finally acknowledged that long-term segregation can severely harm prisoners but because *Plaintiffs* have adequately alleged Defendants knowingly promulgated harmful conditions.

A.

Qualified immunity fundamentally concerns itself with "fair notice." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). It "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). But this *qualified* immunity extends only as far as "the interest it protects." *Smith v. Wade*, 461 U.S. 30, 55 (1983). Because "there is no societal interest in protecting those uses of a prison guard's discretion that amount to reckless or callous indifference to the rights and safety of the prisoners," *id.*, the immunity's cloak will not embrace them. As the familiar refrain goes, qualified immunity does not shield "those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

These principles are not passive bystanders, rhetorical flourishes courts invoke after they have already decided on the outcome of a qualified-immunity request; they steer the analysis from the outset to reach the result most appropriate to the particular context before the court. Here, the Eighth Amendment prohibits only intentional conduct: a minimum of "'deliberate indifference' to inmate health or safety" is required. *Farmer*, 511 U.S. at 834 (citation omitted). That means correction officers "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and actually "draw the inference" before liability attaches. *Id.* at 837. It follows that when "plaintiffs have made a showing sufficient to" demonstrate an intentional violation of the Eighth Amendment, "they have also made a showing sufficient to overcome any claim to qualified

11

immunity." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001). "[T]he two inquiries effectively collapse into one." *Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996). Dismissal, in other words, remains improper so long as the officers' mental state remains genuinely in issue. That is why, in *Ortiz v. Jordan*, the Supreme Court declined to grant qualified immunity to officers accused of disregarding prisoner safety where the evidence at trial showed the officers were "adequately informed" of the danger to Ortiz and could have "distance[d] Ortiz from the assailant." 562 U.S. 180, 191 (2011).

The controversy here follows the *Ortiz* blueprint to a tee. Hard as Defendants try to portray their arguments as questioning clearly established law, "the pre-existing law [is] not in controversy": It has long been established that "prison official[s] may be held liable for deliberate indifference to a prisoner's Eighth Amendment right to protection against [inhumane conditions] while in custody if the official knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 190 (cleaned up) (citation omitted). What Defendants actually demur is that they did not *know*, until this Court's decision in *Porter*, that the solitary-confinement conditions they promulgated posed "a substantial risk of serious harm" in violation of the Eighth Amendment. *Farmer*, 511 U.S. at 834; *see* Opening Br. 28–37. They may well end up on the winning side of that argument after the evidence comes in, but for now, these "fact[ual]" issues compel us to move this case forward, *Ortiz*, 562 U.S. at 191, unless Defendants' entitlement to qualified immunity appears on "the face of the complaint," *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011).

12

Far from settling the factual issues in Defendants' favor, however, Plaintiffs' allegations proffer evidence of a culpable mind. To start, the Complaint alleges each Plaintiff has suffered from "physical and mental harms," including "depression, anxiety, Post-Traumatic Stress Disorder, schizoaffective disorder, psychosis, hallucinations, insomnia, hearing voices, agitation, mood swings, bouts of disorientation, and inability to concentrate, a rapid heartbeat, sweating, shortness of breath, [and] digestive problems." J.A. 39. Some Named Plaintiffs have lost as much as "30 pounds while in solitary confinement." *Id.* They are "often confused, frightened, isolated, and [ ] occasionally suicidal." *Id.* And these symptoms "manifest in as little as 10 days." *Id.* at 30. But Defendants comprise wardens, officers "responsible for the daily operations" of the two prisons, and professionals "responsible for supervising the mental-health services within VDOC" and "stabilization of the mentally ill." *See id.* at 52. It is more than plausible that these Defendants, who for years have had daily contact with Plaintiffs, were both "aware of" the severe harms Plaintiffs have been suffering and could have "draw[n] the inference" that confining Plaintiffs to solitary existence caused those harms. *Farmer*, 511 U.S. at 837; *see id.* at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

And the Complaint offers even more direct evidence of this "consciousness of risk," *id.* at 840, when it comes to Defendants responsible for creating Step Down: the program trains on-the-ground officers to *scout for* "apathy, lethargy, [and] attention deficits," "poor grooming," "failure to maintain an orderly cell," "failure to complete the *Challenge Series*," "refusal to engage in programming," "lack of impulse control," problematic

13

"attitude," and "disrespect towards staff"—the very symptoms solitary confinement generates. J.A. 78; *see also id.* at 177, 186, 193 (Step-Down policy attached to Complaint).

The 100-page Complaint also suggests that Defendants had instituted similar solitary-confinement systems twice before and have twice been pressured to abandon them to abate severe mental and physical harms. First, almost forty years ago, a class of prisoners sued VDOC over confinement conditions at another maximum-security prison, Mecklenburg. *Id.* at 31. VDOC, to its credit, commissioned a Mecklenburg Study Committee to investigate the prisoners' allegations. After extensive consultations with independent mental-health experts, the Committee denounced the program, closed down Mecklenburg, and reached a comprehensive settlement to "ensure that the systematic degeneration of the correctional operations which occurred at Mecklenburg does not occur again at any institution in the Virginia Department of Corrections." *Id.* at 31, 58–62 (brackets removed). To replace Mecklenburg, VDOC built Red Onion and Wallens Ridge, but the prisons had been operating less than a year when, in 1999, Human Rights Watch released a report identifying major human rights violations in both prisons. *Id.* at 74. The U.S. Department of Justice then initiated an investigation into Red Onion, and threatened another, to examine "the use of isolation" at the prison. *Id.* at 75, 77. And the Connecticut Department of Corrections withdrew its prisoners from Red Onion and Wallens Ridge following a lawsuit by the Connecticut ACLU. *Id.* at 75. And yet, Plaintiffs allege, their circumstances remained unchanged, VDOC merely cladded those same conditions and those same policies in new Step-Down garb. *Id.* at 77–78. Taken as true, these allegations of expert conclusions and government investigations plausibly placed Defendants on notice

14

of the full volley of harms their confinement practices created. *Compare Hope*, 536 U.S. at 741–42 (concluding that reasonable corrections officers "would have known" of the constitutional infirmity of using the hitching post as a discipline measure in part because an Alabama Department of Corrections regulation and a Department of Justice report had both warned against the practice).

Also relevant are the independent expert studies that "had consistently documented the severe and often permanent damage caused by prolonged solitary confinement" in the years leading up to VDOC's promulgation of Step Down. *See* J.A. 102 (collecting journal articles). Even judicial precedent has long noted the deleterious effects of complete sensory deprivation. As far back as 1890, the Supreme Court recognized that prisoners subjected to such confinement exhibited a "semi-fatuous condition" and "violent[t] insan[ity]" and even died by suicide. *In re Medley*, 134 U.S. 160, 168 (1890). More recently, the Court reiterated the "severe" risks of contemporary solitary-confinement regimes that deprive prisoners of "almost all human contact." *Wilkinson*, 545 U.S. at 223–24. And our own Circuit has observed that "[p]rolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Incumaa*, 791 F.3d at 534.

The Court has expressly sanctioned reliance on all such "circumstantial evidence" to prove that "a prison official had the requisite knowledge of a substantial risk" confinement conditions pose. *Farmer*, 511 U.S. at 842. Indeed, the "long duration" of the conditions itself may help establish intent. *Seiter*, 501 U.S. at 300 (citation omitted). Taken together, these allegations present far more than a mere "suggestion to the contrary" the

15

Court has previously held sufficient to defeat summary judgment, let alone a motion to dismiss. *See Farmer*, 511 U.S. at 850. Nor can we "be certain," this early on, "that additional evidence is unavailable" to Plaintiffs to strengthen their claims of culpable officer mental state. *Id.* at 849. Given the procedural posture, the district court was right to deny Defendants' qualified-immunity request.

B.

Defendants advance no argument to defeat these long-accepted pleading practices. They ask instead that we shift frames and focus not on their mental state but on the first, objective prong of the Eighth Amendment analysis. They suggest we apply qualified immunity to just that prong, hold that it was not clearly established by 2012 that long-term isolation violated the Eighth Amendment, and dismiss the case before ever reaching the subjective prong. But such a dissociative approach misconceives the purpose of the objective prong and would crumble foundational qualified-immunity precepts.

Defendants observe that it was not until *Porter* (2019) that this Court held solitary confinement "creates a substantial risk of psychological and emotional harm" "sufficient to justify the objective prong." 923 F.3d at 361.[4] On Defendants' view, the Court largely rested its decision on "recent . . . advances in our understanding of psychology and new empirical methods," which have allowed researchers to properly quantify the "severity of

---

[4] Because Defendants center their arguments on *Porter*, they appear to admit that after *Porter*, no reasonable officer could ignore the harms solitary confinement causes. We thus take their qualified-immunity defense to cover only 2012 (the year Step Down began) to 2019. Plaintiffs also seek declarative and injunctive relief, and qualified immunity, of course, cannot bar such actions. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions." *Id.* at 355. And the Court set its decision apart from earlier ones like *Sweet v. South Carolina Department of Corrections*, 529 F.2d 854 (4th Cir. 1975), which it believed "lacked the benefit of the recent academic literature . . . concerning the harmful psychological and emotional effects of prolonged solitary confinement." *Porter*, 923 F.3d at 358.

Defendants correctly observe *Porter* was the first case in this Circuit to hold severe isolation alone can deprive prisoners of "the minimal civilized measure of life's necessities," violating the Eighth Amendment. *Farmer*, 511 U.S. at 834 (quoting *Rhodes*, 452 U.S. at 347). But they misunderstand the upshot. The Eighth Amendment's objective prong measures the harm (or the risk of harm) prison conditions impose *on Plaintiffs*, it asks whether those conditions in fact "resulted in unquestioned and serious deprivation of basic human needs." *Rhodes*, 452 U.S. at 347. Whether *the officers* had any prior notice that isolation can cause severe injury simply does not bear on that inquiry, Plaintiffs need only to show the conditions are "objectively harmful enough." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (cleaned up) (discussing *Wilson*, 501 U.S. at 303); *see also Wilson*, 501 U.S. at 298 (explaining that "the objective component of an Eighth Amendment prison claim" asks only, "Was the deprivation sufficiently serious?" whereas "the subjective component" inquires into the "culpable state of mind"). Qualified immunity, then, can do no work at this first step; its province lies exclusively with the second.

Eventually, the district court will need to grapple with *Porter*. It will need to analyze whether these Defendants, like the ones in *Porter*, were actually aware of "the extensive

17

scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement." 923 F.3d at 361. And will need to decide whether the types of harms deemed obvious there show themselves here—or whether the conditions Plaintiffs challenge and the harms they allege are more akin to those advanced in cases like *Sweet*. *Compare id.* (citing Defendants' own observations of how prolonged solitary confinement affected prisoners as well as scholarly literature to conclude that the severe psychological and emotional harm the plaintiffs suffered "was so obvious that it had to have been known" (citation omitted)), *with Sweet*, 529 F.3d at 858, 862, 864–66 (granting qualified immunity to prison officials because the plaintiff could not establish he actually suffered the deprivations he alleged—inadequate food and shower time, inability to engage in religious practices, and lack of reading and writing material—and did not "claim . . . that he has been subjected to any cruel treatment" like other prisoners "in strip cells"). Rather than support Defendants' piecemeal approach, however, these yet-unresolved considerations demonstrate why it would be a mistake to decouple the two Eighth Amendment prongs: The objective prong alone tells us nothing of *Defendants'* behavior.

Defendants' arguments were presumably inspired by how courts analyze qualified immunity in the Fourth Amendment context. Take a prototypical case, *Kisela v. Hughes*, which considered whether to immunize an officer who shot a woman for fear she would harm a neighbor. 138 S. Ct. 1148, 1153 (2018). The Court found immunity appropriate because the situation the officer faced—an erratic woman waiving a knife steps away from her neighbor and refusing repeated calls to put down the weapon—was "far from an obvious case in which any competent officer would have known" the shooting would

violate the Fourth Amendment. *Id.* But that analysis does not pair well with the Eighth Amendment, which does not concern itself with what "a reasonable person would have known." *Farmer*, 511 U.S. at 843 n.8. That a *reasonable* corrections officer might not have known, before *Porter*, that isolation tends to cause severe injuries, simply does not bear on whether *these* officers observed the injuries *these* Plaintiffs have pleaded and drew appropriate inferences as to what caused those injuries.

We recognize the Ninth Circuit takes a different tack, applying qualified immunity separately to each Eighth Amendment prong. *See Est. of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1048–49 (9th Cir. 2002) (discussing *Saucier v. Katz*, 533 U.S. 194, 203–06 (2001)). But the court's analysis fails to persuade us. In *Saucier*, the Supreme Court considered an argument that "qualified immunity is merely duplicative in an excessive force case" "because the Fourth Amendment's guarantee was a right to be free from 'unreasonable' searches and seizures" and so "it would be inconsistent to conclude that an officer who acted unreasonably under the constitutional standard nevertheless was entitled to immunity because he 'reasonably' acted unreasonably." 533 U.S. at 203 (citation omitted). The Court acknowledged the argument had "surface appeal"; in the end, however, it found qualified immunity to have "a further dimension": "An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances." *Id.* at 204–05. The Ninth Circuit takes that discussion to apply to the Eighth Amendment, as well. An officer, the court believes, "could know all of the facts yet mistakenly, but reasonably" "draw the inference" that no substantial risk of serious harm exists. *Ford*, 301 F.3d at 1050. That

conclusion is at odds with itself.  To be deliberately indifferent, an officer must not only know of the confinement conditions but also accurately assess the risk that those conditions deprive a prisoner of minimal civilized necessities.  *See Farmer*, 511 U.S. at 840 ("Eighth Amendment liability requires consciousness of a risk").  By definition, no liability attaches if the officer *inaccurately* assesses that risk—for then she cannot be *deliberately* indifferent.

Beyond these conceptual inconsistencies, the Ninth Circuit's approach writes the subjective inquiry out of the Eighth Amendment and with it, all assessment of Defendants' conduct.  It thus unravels qualified immunity's very justification, like a loose stitch unravels the entire garment.  *See Pierson v. Ray*, 386 U.S. 547, 557 (1967) (founding the qualified-immunity doctrine to extend protections to "good faith" mistakes).  So, we side instead with the Third, Seventh, and Eighth Circuits and decline to grant qualified immunity on just the first, objective prong where Plaintiffs satisfactorily plead Defendants' deliberate indifference because Defendants "could not believe that [their] actions comported with clearly established law while also believing that there is an excessive risk to the plaintiffs and failing to adequately respond to that risk." *Beers-Capitol*, 256 F.3d at 142 n.15; *see also Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002); *Miller v. Solem*, 728 F.2d 1020, 1024–25 (8th Cir. 1984).

C.

Reframing the argument yet again, Defendants additionally object we cannot define prisoners' rights at too-high a level of generality.  It is not enough, Defendants insist, to

say the law clearly prohibited a knowing disregard of a serious injury: "To be clearly established," the law "must be sufficiently clear that every reasonable official would have understood that what he is doing violates" the Eighth Amendment. Opening Br. 27 (quoting *Mays*, 992 F.3d at 301). And, according to Defendants, no reasonable officer would have understood *that* until *Porter* decided isolation alone can cause severe injury.

This argument suffers from the same flaw as Defendants' call to sever the two Eighth Amendment prongs: It overlooks the fact that Eighth Amendment liability hinges on whether an officer deliberately ignores the harms confinement conditions cause. As we have posited in the related context of excessive-force claims under the Eighth Amendment, "because an officer necessarily will be familiar with his own mental state, he 'reasonably should know' that he is violating the law if he acts with a prohibited motive." *Dean v. Jones*, 984 F.3d 295, 310 (4th Cir. 2021) (quoting *Brooks v. Johnson*, 924 F.3d 104, 119 (4th Cir. 2019)). He does not need precedent to tell him that; he can use his own "state of mind" as "a reference point" to "assess conformity to the law." *Thompson v. Virginia*, 878 F.3d 89, 106 (4th Cir. 2017); *see also United States ex rel. Citynet, LLC v. Gianato*, 962 F.3d 154, 159 (4th Cir. 2020) (holding qualified immunity inapplicable to allegations under the False Claims Act (FCA) because FCA liability depends on whether a government official "*knowingly* violate[s] the law" (citations omitted)); *Raub v. Campbell*, 785 F.3d 876, 884 n.8 (4th Cir. 2015) ("a law enforcement officer's omission of material facts from a warrant affidavit deprives him of qualified immunity . . . if the omission was made intentionally or with a 'reckless disregard for the truth'" (citation omitted)); *Washington v.*

21

*Wilmore*, 407 F.3d 274, 283–84 (4th Cir. 2005) (no immunity where officials knowingly falsified evidence to obtain a criminal conviction).

And we are not alone in this approach. As discussed, that is exactly how the Supreme Court analyzed the matter in *Ortiz*. *See* 562 U.S. at 190. Rather than looking for precedent exactly on point, the Court reasoned that "the pre-existing law was not in controversy" because it has long been established that a "prison official may be held liable for deliberate indifference to a prisoner's Eighth Amendment right to protection against violence while in custody if the official knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* (citation omitted); *see also Hope*, 536 U.S. at 744–45 (qualified immunity does not shield government officials where they have "ignore[d]" a regulation "with impunity"). And while the Court has regularly insisted on highly particularized law in the Fourth Amendment context, it has not done the same with Eighth Amendment claims. *Compare City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) ("Such specificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015))), *Kisela*, 138 S. Ct. at 1152 (same), *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (same), *and Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (same), *with Hope*, 536 U.S. at 738–39 (declining to inquire whether "the very action in question has previously been held" to violate the Eighth Amendment and rejecting qualified immunity because "the risk of harm is obvious"), *Taylor*, 141 S. Ct. at 54 ("Confronted with the particularly egregious facts of

22

this case, any reasonable officer should have realized that Taylor's conditions of confinement offended the Constitution."), *and McCoy v. Alamu*, 141 S. Ct. 1364, 1364 (2021) (instructing the Fifth Circuit to reconsider an Eighth Amendment excessive-force case "in light of *Taylor*").

Insistence on finding precedent that held the same exact confinement conditions invalid also transforms the objective prong into something that it is not.  The Eighth Amendment "does not prohibit cruel and unusual prison *conditions*."  *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993) (emphasis added).  It asks instead whether the conditions of confinement *inflict harm* that is, objectively, sufficiently serious to deprive a prisoner of minimal civilized necessities.  *Farmer*, 511 U.S. at 834.  "No static 'test'" can settle that, courts have explained.  *Strickler*, 989 F.2d at 1379 (quoting *Rhodes*, 452 U.S. at 346).  Even double bunking "could rise to the level of constitutional violations."  *Id.* at 1381.  So can "a low cell temperature at night combined with a failure to issue blankets," *Wilson*, 501 U.S. at 304, "overcrowding accompanied by unsanitary and dangerous conditions," *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991), and "inadequate ventilation," *Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir.1990).

In keeping with those principles, our precedent has focused on whether a prisoner "has come forward with . . . *evidence* that he has sustained . . . significant physical or emotional injury as a result of" solitary-confinement conditions.  *Strickler*, 989 F.2d at 1381 (emphasis added).  Correspondingly, we have denied the claim only where a plaintiff failed to establish that "isolation from companionship, restriction on intellectual stimulation and prolonged inactivity" has exacted any psychological or physical toll.

*Sweet*, 529 F.2d at 861 (internal quotation marks and citation omitted); *see also Mickle v. Moore*, 174 F.3d 464, 472 (4th Cir. 1999) (rejecting Eighth Amendment allegations because "the only evidence submitted on this point were the affidavits of a few inmates" the court deemed insufficient to assert a claim); *Rhodes*, 452 U.S. at 348 (finding "no evidence that double celling under these circumstances . . . inflicts unnecessary or wanton pain"). Yet in the obverse, we have felt "constrained" to deny outright grants of qualified immunity and remand for further factfinding where the allegations have signaled prison conditions *could* "amount to cruel and unusual punishment." *Sweet*, 529 F.2d at 866 (internal quotation marks omitted). The Court in *Sweet*, for example, denied summary judgment—not merely a motion to dismiss—and directed the district court to "take additional testimony and consider in greater detail whether the health of the plaintiff may be adversely affected by the restricted exercise rights accorded to him." *Id*.

All of this makes good sense—and not incidentally dovetails with the Eighth Amendment inquiry into corrections officers' mental state. For the same reasons as discussed extensively above, Defendants cannot protect themselves based on the failure of other plaintiffs in other cases to demonstrate severe enough harm when in *this* case, Plaintiffs have adequately pleaded both that they suffered extreme injuries and that Defendants were aware of them. The district court was right to deny immunity and give

Plaintiffs the opportunity to prove Defendants deliberately inflicted the harm. For qualified immunity cannot shield them if they did.[5]

IV.

Our analysis of due process entails a two-part inquiry, as well. We first determine whether Plaintiffs had a protectable liberty interest in avoiding security detention. *See Burnette v. Fahey*, 687 F.3d 171, 180 (4th Cir. 2012). We then evaluate whether Defendants failed to afford minimally adequate process to protect that liberty interest. *Id.* at 181. Defendants raise a qualified-immunity defense on both steps. We easily dispose of the first, because Supreme Court cases dating back to at least 2005 held materially indistinguishable conditions trigger Fourteenth Amendment protections. As to the second, Defendants correctly observe our Circuit has yet to determine the exact review due to prisoners in long-term solitary confinement. But Plaintiffs allege Defendants failed to meet even the most basic due process requirements like notice and a meaningful opportunity to

---

[5] Plaintiffs briefly suggest an alternative theory of liability—that "subjecting prisoners to harmful conditions for no legitimate penological purpose violates the Eighth Amendment." Resp. Br. 38 (capitalization altered). But our Circuit recognizes only two discrete Eighth Amendment paths: "conditions of confinement," discussed here, where a plaintiff prevails upon a showing that prison officials deliberately disregarded a significant injury, and "excessive force," which "does not require that the prisoner victim suffer a 'significant injury'" but "does require malicious intent." *Thompson*, 878 F.3d at 97–98. Absence of penological purpose plays a part in both of these inquiries, as it helps establish that corrections officers acted with culpable mental state rather than for justifiable reasons. *E.g.*, *Lopez*, 914 F.2d at 490 (looking to "institutional competence" and penological objectives to decide whether "prison administrators' conduct constitutes *deliberate indifference*" (emphasis added)); *Dean*, 984 F.3d at 302 (asking "whether force was applied in a good faith effort to maintain or restore discipline or *maliciously and sadistically* for the very purpose of causing harm" (emphasis added) (citation omitted)). But we do not recognize a standalone Eighth Amendment violation for lack of penological justification.

25

be heard and that the criteria Defendants employ to assess solitary placements are entirely divorced from legitimate penological interests. On those allegations—and at this litigation stage—Defendants cannot claim immunity.

A.

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," but a prisoner's liberty does not disappear entirely. *Price v. Johnston,* 334 U.S. 266, 285 (1948). In our Circuit, prisoners retain a liberty interest in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," provided they can first establish that interest "arise[s] from state policies or regulations." *Incumaa*, 791 F.3d at 526–27 (first quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995); then quoting *Prieto v. Clarke*, 780 F.3d 245, 249 (4th Cir. 2015)).

Because "uncontroverted evidence" establishes that Step Down mandates review at least once every 90 days, Defendants sensibly do not dispute that Plaintiffs have adequately traced their interest to state regulations. *See Incumaa*, 791 F.3d at 527. The parties quarrel instead over whether the solitary conditions are sufficiently harsh and atypical. We have no doubt that they are. We also have no doubt their harshness has been clearly established, for confinement conditions here are even more onerous than conditions the Supreme Court unanimously recognized gave rise to this liberty interest in 2005. *See Wilkinson*, 545 U.S. at 214–15. As in *Wilkinson*, Plaintiffs "must remain in their cells" for about "23 hours per day," "have solid metal doors with metal strips along their sides and bottoms which prevent

conversation or communication with other inmates," have "rare" visitations "conducted through glass walls," and must live—and sleep—with the light on "at all times." *Id.* at 214. "Aside from severity of the conditions," Plaintiffs' placement "is for an indefinite period of time" and precludes parole. *Id.* at 214–15. Besides these deprivations the Court deemed sufficient in *Wilkinson*, Plaintiffs also cannot partake in "productive activities," like art or education or voluntary work, must endure dehumanizing, daily cavity searches, and lose all "good time credit" they could have otherwise earned in general population. J.A. 71–73; *see also Incumaa*, 791 F.3d at 531 (reasoning that subjecting a prisoner "to a highly intrusive strip search every time he leaves his cell" significantly "worse[ns]" conditions *Wilkinson* already found trigger due process protections); *Smith v. Collins*, 964 F.3d 266, 281 (4th Cir. 2020) (confirming, after a 22-page discussion, that "there is at least a genuine issue of material fact" as to whether the current solitary confinement conditions in Wallens Ridge implicate a protected liberty interest established in *Wilkinson*).

Defendants raise two cursory objections in their opening brief. They first contend the conditions are not so onerous as those in *Wilkinson* because prisoners "have an opportunity to progress through to levels with increasingly greater privileges," making solitary confinement here more comparable to the conditions in *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997), which involved a six-month-long disciplinary segregation, or *Sandin*, 515 U.S. at 486, which considered one lasting thirty days. Opening Br. 57. But Plaintiffs allege VDOC does *not* provide a genuine opportunity to progress through the program—an allegation well supported by Plaintiffs' own extended residences in Red Onion and Wallens Ridge. *See Collins*, 964 F.3d at 278 (reversing a grant of summary

27

judgment motion in VDOC's favor because Smith argued "the Program did not provide *him* with a viable path to release"). Plaintiffs also dispute Defendants' characterization of "increasingly greater privileges," asserting that solitary conditions remain largely the same throughout the entire program—not least because prisoners remain housed in the same supermax cells. *See* J.A. 101–02. To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). Plaintiffs' allegations easily satisfy that standard.

Defendants finally suggest that while *Wilkinson* may have established a liberty interest in avoiding initial assignment to administrative segregation, it did not recognize an interest in being released from it. Nothing in *Wilkinson* turned on that distinction and, in any event, we have already confirmed in *Incumaa* that materially similar conditions give rise to a protected interest "in leaving" those conditions. *See* 791 F.3d at 534. Tellingly, Defendants do not discuss either of these arguments on reply.

We hold that by 2012, when VDOC instituted Step Down, case law had clearly established that solitary-confinement conditions comparable to those Plaintiffs allege here engendered a protected liberty interest under the Fourteenth Amendment.[6]

---

[6] To the extent Defendants seek qualified immunity because district courts and unpublished opinions from this Circuit have upheld solitary confinement conditions in Red Onion and Wallens Ridge, we cannot agree. As we have explained over and again, "published district court opinions, like unpublished opinions from our Court, have no precedential value," and we do not consider them when surveying clearly established law. *Collins*, 964 F.3d at 282 n.11 (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017)).

B.

Defendants also contest the district court's denial of qualified immunity on the second prong, which examines the process due. They draw primarily on *Hewitt v. Helms*, which concluded that "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration" and, consequently, that "the Due Process Clause requires only an informal nonadversary review." 459 U.S. 460, 468, 474 (1983). Beyond that "limited due process," Defendants reason, no procedures have been clearly established, *Baker v. Lyles*, 904 F.2d 925, 930 (4th Cir. 1990), and the multiple formal and informal levels of review Step Down provides must certainly pass that bar.

At the outset, we observe that *Hewitt* considered a solitary-confinement period lasting less than two months, imposed to investigate the plaintiff's role in a prisoner riot. *Hewitt*'s animating consideration—that prisoner "should reasonably anticipate" administrative confinement—thus does not translate seamlessly to today's practices of indefinitely confining prisoners to supermax facilities. *See, e.g.*, *Mims v. Shapp*, 744 F.2d 946, 951–52 (3d Cir. 1984) (finding that the *Mathews* balancing *Hewitt* employed to assess the process due may well yield a different result when applied to "potentially limitless" solitary confinement because its "indefinite nature" creates "a more significant liberty interest"); *Proctor v. LeClaire*, 846 F.3d 597, 610 (2d Cir. 2017) (same).

Still, Defendants' broader point is true enough—neither the Supreme Court nor this Circuit's precedent has clearly established the exact process prisoners must receive while in long-term administrative segregation. *Wilkinson*, for example, only upheld the review

29

the prison provided; it did not establish a floor governing future cases.  *See* 545 U.S. at 209, 216–17 (approving a "three-tier classification review process" that provided prisoners a 48-hour notice, mandated correction officers to disclose their reasons for recommending solitary placement and allowed prisoners to file written objections with the Bureau).  On the opposite end of the spectrum, *Incumaa* allowed a prisoner's challenge to proceed where the supermax provided "only a single-layered confinement review" that, by regulation, did "not grant [prisoners] the right to contest the factual bases" for their continued solitary detention.  791 F.3d at 534–35.  Neither case thus "definitively require[d]" a particular set of procedures.  *Halcomb v. Ravenell*, 992 F.3d 316, 322 (4th Cir. 2021) (finding that our case law does not clearly mandate "prior" notice of segregation hearings).

But Defendants once again mistake Plaintiffs' arguments.  Plaintiffs do not challenge Step Down as failing to live up to *Wilkinson*'s multitiered standard.  Nor do they request any discrete procedures like advance notice, an opportunity to offer witnesses, or a possibility of appeal.  They assert instead, similar to plaintiffs in *Incumaa*, that the program transgresses even the most foundational building blocks of due process: notice of the charges against them and an opportunity to be heard.  That is, although Step Down offers multiple levels of review on paper, some occurring as frequently as every 30 days, not one of those reviews actually lives up to "basic" due process scrutiny.  *Incumaa*, 791 F.3d at 533, 535 (rejecting defendants' argument that periodic reviews per se satisfy *Hewitt* and *Wilkinson* where plaintiffs demonstrated "the inadequacy" of those reviews).

Consider, for example, Plaintiffs' allegations that, by policy, only the so-called "formal" ICA and ERT hearings contemplate prisoner involvement of any kind—the

"informal" BMC, prison-official, and counselor reviews do not provide any information to prisoners, much less involve them in the rating process. *See* J.A. 88, 92 (explaining that VDOC conducts these reviews "in secret, with no notice to the prisoner" and "does not permit prisoners to obtain a copy of their Status Rating Charts"). And that the formal reviews, however impressive they sound on paper, do nothing for Plaintiffs in practice. The ICA, they allege, holds hearings lasting only moments and issues pre-filled forms that merely document (rather than review) Plaintiff's previously determined progress through Step Down, doling out conclusory rationales such as "Remain Segregation" or "needs longer period of stable adjustment." *Id.* at 94–95. Whereas the ERT examines only "the *original* decision to place the prisoner on the IM Pathway," provides prisoners "no written explanation of its decisions," and conducts hearings so rarely that "[m]any IM prisoners have never seen or heard of the ERT." *Id.* at 97–98.

But if the Due Process Clause means anything, it requires at least "that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Mathews*, 424 U.S. at 348 (cleaned up) (citation omitted). That is the "essence of due process." *Id.*; *accord Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."). That is why *Hewitt* demanded corrections officers provide prisoners a notice or explanation "of the charges against" them and an "opportunity to present [their] views" through "written statement" or "oral presentations," 459 U.S. at

31

476, why *Wilkinson* insisted that officials "provide a brief summary of the factual basis for the classification review" and allow "a rebuttal opportunity," 545 U.S. at 226, and why *Incumaa* allowed prisoners to prove review committees failed "to provide a factual basis for" their decisions, "merely rubber-stamp[ing]" solitary incarceration, 791 F.3d at 534–35. Even *Halcomb*, which denied the prisoners' request that corrections officers provide them *advance* notice, recognized Supreme Court precedent requires at minimum that prisoners "receive information *at some point* as to why a change in security status is being recommended as well as an opportunity to respond." 992 F.3d at 322 (emphasis added). Absent these elementary requirements, established long ago, prisoners simply do not have "a meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349.

Defendants do not seriously argue they lacked notice of these basic due process requirements; they merely dispute Plaintiffs' factual allegations and urge us to take judicial notice of several Step-Down provisions. But what we said about the motion-to-dismiss stage in the context of the Eighth Amendment, applies with full force here, as well: We take Plaintiffs' allegations as true. And, notwithstanding what Step Down lays out on paper, qualified immunity often "turn[s] on whether the multiple review mechanisms . . . were meaningful in practice." *Collins*, 964 F.3d at 282. Judicial notice of Step-Down provisions, then, cannot end the controversy, and the district court properly allowed the Fourteenth Amendment claims to proceed.

But Plaintiffs allege yet more. The kind of meaningful review *Hewitt* prescribes, they insist, contemplates that correction officers will use "institutional safety and security (or another valid administrative justification) as their guiding principles." *Proctor*, 846

F.3d at 611. And although *Hewitt* appropriately recognized that periodic review must remain "flexible" to account for "a wide range of administrative considerations," Plaintiffs observe the Court also held "administrative segregation may not be used as a pretext for indefinite confinement." 459 U.S. at 472, 477 n.9. We agree. *Hewitt* afforded flexibility *because* the State has a "manifest interest in maintaining safe detention facilities." *Proctor*, 846 F.3d at 611. And when a precarious situation ends, with it ends the State's authority to maintain prisoners in solitary confinement. *See Hewitt*, 459 U.S. at 477 n.9 (describing the periodic-review decision as "whether a prisoner remains a security risk"); *Wilkinson*, 545 U.S. at 226 (warning against placing prisoners in solitary confinement "for insufficient reason"); *see also Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975) (recognizing, as early as 1975, that the "validity" of administrative segregation under the Fourteenth Amendment depends upon "the existence of a valid and subsisting reason or reasons for the segregation"); *Mims*, 744 F.2d at 953 (citing *Hewitt* as establishing that the constitutionality of administrative segregation "subsists only as long as the inmate continues to pose a safety or security risk"); *Selby v. Caruso*, 734 F.3d 554, 560 (6th Cir. 2013) (denying qualified immunity because "since *Hewitt* . . . , prison officials have been on notice that administrative segregation may not be used as a pretext for indefinite confinement" (internal quotation marks and citation omitted)); *Quintanilla v. Bryson*, 730 F. App'x 738, 744 (11th Cir. 2018) (citing *Hewitt*, among others, for the proposition that "officials must be guided by whether confinement in administrative segregation remains necessary in light of . . . valid administrative justifications"). Defendants, therefore, had clear notice after *Hewitt* that Step Down must reflect legitimate penological necessities.

Yet Plaintiffs allege that Step Down placements rest on "reasons having nothing to do with" prisoners' security risk and everything to do with justifying the two high-ticket supermaxes. J.A. 82. From the start, the policy advises corrections officers to rely primarily on prisoners' "criminal history and lifestyle" as well as whether they "are incarcerated for a high profile and notorious crime" when deciding whether to assign prisoners to Red Onion or Wallens Ridge. *Id.* (citation omitted). Plaintiffs argue these considerations inappropriate because they were all sentenced to general population. *Id.* at 37. So rigid criteria based on prior criminal history cannot supply a penologically valid justification and evidence instead Defendants' goals to fill more beds. *See id.* at 83–84.

At the next step, Plaintiffs claim VDOC's policy permits corrections officers to hold prisoners at the same level, regress them, or even force them to restart the entire program based on metrics unrelated to prison security like hygiene, rapport with guards, and respect—metrics corrections officers themselves have described as "very subjective" during depositions. *Id.* 87–91 (citation omitted). For example, Plaintiffs allege that "VDOC has required prisoners to restart the Step-Down Program for failure to shave their beard, use of 'insolent language,' . . . [and] refusal to complete the *Challenge Series*" workbook. *Id.* at 90. And that "[p]risoners who cannot complete the workbook series because of educational background, learning disability, cognitive disability, mental illness, or language barrier are evaluated on the same criteria as prisoners without those disabilities or barriers." *Id.* at 89. These shortcomings, Plaintiffs suggest, demonstrate Defendants are not interested in offering a meaningful pathway out of solitary; they seek instead to *keep* prisoners in segregation for as long as possible.

Finally, when it comes to formal reviews, Plaintiffs complain the ICA does not review the officers' assessment of prisoners' progress through Step Down, just their "external" placement in the supermax facilities. *Id.* at 94. But by regulation, successful completion of Step Down "is the only avenue" to general population. *Id.* at 95. The ICA review, Plaintiffs reason, thus amounts to "hollow" formalities. *Proctor*, 846 F.3d at 608.

If proven, such dissonance between legitimate penological goals and the processes Step Down institutes may lead a trier of fact to conclude Defendants designed the program for an improper purpose, like economic gain. *See Selby*, 734 F.3d at 560 ("Whether a given process is meaningful for the purposes of the Due Process Clause is a question of fact." (citation omitted)). Because *Hewitt* plainly established, in 1983, that Defendants can do no such thing, a grant of qualified immunity would be plainly inappropriate at this stage.

V.

Though the parties frame this appeal as presenting questions of qualified immunity, *see, e.g.*, Opening Br. 2, Defendants appear to additionally argue that Plaintiffs fail to plausibly allege either a facial or an as-applied due process challenge. A facial challenge, Defendants maintain, "can only succeed by establishing that no set of circumstances exist under which Step-Down Program would be valid," whereas Plaintiffs pleaded only that Step Down "does not provide *many* prisoners with any real opportunity from segregation." *Id.* at 52–53 (cleaned up) (citation omitted). Nor, according to Defendants, have Plaintiffs sufficiently alleged Defendants' personal involvement in Step Down "as applied to them" because Plaintiffs have not identified "any specific segregation review of their own that

35

they allege failed to comport with procedural due process." *Id.* at 53–54. Defendants do not reprise these arguments on reply.

The Complaint makes clear Plaintiffs request both facial ("abolish the Step-Down program") and as-applied ("award[ ] *Plaintiffs* compensatory damages") relief. *See* J.A. 123 (emphasis added). But the propriety of either "goes to the breadth of the remedy," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010), and depends on whether a broad constitutional judgment is required to "adjudicat[e] rights in particular cases between the litigants brought before the Court," *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973). Down the line, if Plaintiffs succeed on their due process claim, the district court will need to decide whether the evidence presented justifies broad relief implicating the entire Step Down or whether Plaintiffs' harms can be remedied through damages and a tailored injunction. But in no case will the remedy depend on what Defendants infer from the Complaint's brief observation that Step Down "does not provide many prisoners with any real opportunity from segregation." Opening Br. at 52–53 (cleaned up) (citation omitted).

Defendants' arguments on the as-applied challenge fall similarly flat. To the extent Defendants protest Plaintiffs have not adequately alleged their individual involvement, that is simply not so. The Complaint painstakingly sets forth each Defendant's role in either creating or administering Step Down. *See* J.A. 44–52. If, on the other hand, Defendants object that Plaintiffs have not alleged sufficient facts showcasing why their own reviews fail constitutional requirements, the contention is impolitic at best. Plaintiffs allege, over dozens of pages, that Defendants conduct reviews in secret, that Plaintiffs have no access

to their informal rating charts, and that formal hearings last only moments at Plaintiffs' cell doors and result in conclusory assessments like "Remain Segregation." *See supra* pp. 30–31. Those allegations compellingly demonstrate why Plaintiffs lack more particularized evidence at this point in the litigation. And they easily meet the "short and plain statement" requirement. Fed. R. Civ. P. 8(a)(2).

## VI.

For the foregoing reasons, the district court's judgement is

*AFFIRMED*.